UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------x
UNITED STATES OF AMERICA

-v-

JONATHAN DEUTSCH,
-----------------------------------------------x

**MEMORANDUM AND ORDER**
Case No. 18-cr-502 (FB)

Appearances:

*For the Defendant*:
DEIRDRE VON DORNUM
KANNAN SUNDARAM
Federal Defenders of NY
One Pierrepont Plaza
Brooklyn, NY 11201

*For the United States of America:*
MEGAN ELIZABETH FARRELL
MARGARET ELIZABETH LEE
U.S. Attorney's Office, E.D.N.Y.
271 Cadman Plaza East
Brooklyn, NY 11201

**BLOCK, Senior District Judge:**

The Court ordered Jonathan Deutsch ("Defendant") released from pretrial detention on June 4, subject to a $100,000 bond secured by his parent's home and 17 conditions of release, including location monitoring, no use of internet-capable devices, installation of computer monitoring software, and control and monitoring of internet routers within Defendant's household. ECF 68 ("June 4 Order"). The Government appealed that Order on June 5 and thereafter secured a superseding indictment on June 11, adding six "attempted sexual exploitation of a minor" counts arising from the same conduct and victims charged two-years prior in the original five-count indictment. The Court arraigned Defendant under the superseding indictment on July 1, and now orders his pre-trial release under the same conditions imposed by the June 4 Order.

Defendant was arrested in September 2018 and charged with five counts of producing child pornography based on alleged internet conversations he had with then-minors between January and May of 2017. Ten months prior, he was arrested and charged under New York state law in connection with some of the same acts alleged in the federal indictment. In the state case, Defendant was released on his own recognizance and he attended all of his state-court appearances and fully complied with the terms of his release. The state charges were eventually dismissed when the Kings County District Attorney referred the case to the United States Attorney for the Eastern District of New York. In the 20-months since, the Defendant made—and this Court denied—six different bail applications.

I.

Since Defendant's arraignment in 2018, the primary issue animating his bail hearings has been the danger he posed to the community via the internet and Pretrial Services' ability to monitor routers and internet-capable devices in Defendant's household[1]:

[1] The Government's recent submissions highlight Court comments from February 2019—a year and a half ago—regarding Defendant's potential risk of flight. *See, e.g.*, ECF 65 at 5. Of course, it's easy to cherry-pick when the past 20-months have created a veritable orchard of transcripts to pluck from. Even still, the Government misrepresents the nature of our hearings. At all times, the central issue has been how Pretrial Services could adequately monitor the Defendant's internet usage.

- THE COURT: Are you concerned that he'll have physical contact with individuals, with minors, or are you concerned that he'll have internet contact? Can you be more specific?

  MS. FARRELL: Both, your Honor. I think both are a possibility. It's clear that he has had internet contact, substantial internet contact, and has done so using multiple Facebook profiles. (Sept. 19, 2018 Tr. at 9).

- MS. FARRELL: To be clear, whether there's physical contact or not, there was tremendous harm done to these minors. Even if the defendant does not engage in physical contact, there can still be tremendous harm done to minors.

  THE COURT: Of course.

  MS. FARRELL: He continues to have an active Facebook page. He continues to have access to the internet. . . . I just want to be clear that the risk exists, notwithstanding any physical contact.

  THE COURT: I don't think that's what he's suggesting and I also think that if the defendant were released, I don't think anyone is proposing that he be going back to school, working, or that he would be allowed out of the house. <u>The question really is, does he pose a danger to the community by the nature of the charges and the nature of his conduct, and by the fact that it's difficult to police people's participation in internet activities.</u> (*Id.* at 25–26).

- MS. KEEGAN [Pretrial Services]: . . . I think the primary concern for Pretrial in any case is monitoring that cyber portion, and we would just be a little bit concerned with that. (*Id.* at 30).

- THE COURT: . . . I think I'm less concerned about risk of flight because of the ties to the community and because the property involved would I think seriously tie up the parental income and it is the parents' home. I am more concerned about the risk of danger to the community. That's the greatest concern that I have.

  . . .

  . . . [T]here is a serious potential of danger to the community if he were to be allowed to have access to minors, and that would be either

in person or through the internet. So I think the real question is, to what extent can we be satisfied, if he were released, that he would not have access to the internet. (*Id.* at 37–38).

- THE COURT: . . . [T]he weight of the evidence at this point is that he would present a risk of danger to the community. I understand that there are conditions that can be imposed I'm concerned that it is possible—that it is not possible to prevent access, complete access to the internet, at least based on what I've heard today in court.

  I therefore find that the evidence is—the government has made a clear and convincing showing of danger to the community. I do not find risk of flight, I do find clear and convincing evidence. I also don't think that the bail package is sufficient at this point to overcome that risk. I don't know if there's a way to come up with conditions that would guarantee, and I think we'd need a pretty strong guarantee of no access to the internet. I don't know if there's a way to do that but I'm not convinced at this point that that has been shown. (*Id.* at 39–40).

- THE COURT: But can there be a guarantee or more than a reasonable assurance that a person won't have access to a danger instrumentality? That's I think the question. (Sept. 21, 2018 Tr. at 5).

- MS. FARRELL: . . . Your Honor, and to really go to I think the crux of the issue here, which is the danger to the community, which the Court identified as a risk the other day, the Government is in agreement. It agrees that the reasonable assurance that is required—and that's without having reviewed the cases that defense counsel cites—that the reasonable assurance that is required is that the community be safe. And here, as the Court noted, that's not possible so long as the defendant can access the internet. (*Id.* at 13–14).

- MS. FARRELL: . . . [T]he risk of the online conduct, which is what is the essence of the case. (*Id.* at 22).

- THE COURT: . . . I think what the issue is here, and it's why it's a tough one, is not whether it's possible to completely interdict all internet use, but whether it can be reasonably restricted, and whether or not, in this particular case, the moral suasion of having his parents as third-party custodians and really being with him and uprooting their lives to make sure that he follows the rules, whether that's enough. That's really the question.

  MS. FARRELL: Right. I agree.

  THE COURT: It's whether the conditions are sufficient. (*Id.* at 37).

- MS. FARRELL: Excuse me, Your Honor. I just want to—if Your Honor is contemplating on this bail package, we have to contact Florida to determine whether Florida is capable of—what their cyber-monitoring program is.

  . . .

  Yes, Your Honor. We did speak to the Middle District of Florida, Pretrial Services, and they indicate that they do not have a cyber monitoring program, meaning they don't actively put a software in any device. What they do is they visually inspect the residents for devices. (*Id.* at 41, 46).

  . . .

  THE COURT: Okay. Well, my finding was that if Florida—<u>if there were proper monitoring the Florida residents would work, but without the possibility of monitoring. It just doesn't work.</u>

  . . . If things can change and you can put together some kind of a package where there would be some monitoring in Florida, that's something that I would consider, but I haven't seen anything that would work in New York at this point. (*Id.* at 47–48).

- THE COURT: So, I will ask the Government if he is denied access to the internet, does this not resolve your concerns that other people could possibly be victimized if he's at liberty?

  MS. FARRELL: Your Honor, it doesn't with respect to this particular defendant because of the ease with which individuals can obtain

internet-capable defense and evade supervision of Pretrial (Oct. 24, 2019 Tr. at 12–13).

- THE COURT: So let me try to ask Ms. Carlson [from Pretrial Services] some questions here. If he is going to be released, what opportunity does Pretrial Services have to monitor, as far as the correction officer, how would you go about monitoring all of this if he were to be released? He would be at home confinement and you would be able to, I take it, have access to his computers or the Internet? Tell me how that would work out.

  MS. CARLSON [Pretrial Services]: . . . So, Your Honor, as you are aware, the defendant is—the previously bail application hearing, the Middle District of Florida does not conduct cyber monitoring. So if he were released and there are Internet-capable devices in the home of his father or something that he would want to use with monitoring software, Pretrial in Florida would not be able to monitor those devices. (May 29, 2020 Tr. at 16).

- MR. SUNDARAM: Your Honor . . . I have two points, two responses: One, as we laid out in detail in our rely beliefs, the—I think that – if you talk about the specific risks here, the most specific risk that the Court and the Government is just focusing on in Pretrial from the beginning is this very particular Internet risks. That's the only risk the Court was concerned about in the beginning, and that specifically would be the risk of Mr. Deutsch potentially getting on the computer and contacting a minor now.

  . . .

  . . . [A]s I understand it, the Middle District of Florida doesn't itself do cyber monitoring. That's what this means, he can't do cyber monitoring. My understanding is his father would bring their devices here and Pretrial could install cyber monitoring here. You don't have to be physically in proximity to the device to do cyber monitoring. They could do the—they could insist that it would be done by the Eastern District of New York instead of the Southern District of Florida. They could insist that it be done physically --

  THE COURT: How would that happen? I'm not so, you know, savvy about these things.

> MS. CARLSON: Your Honor, if I may?
>
> THE COURT: Yeah, go ahead.
>
> . . .
>
> MS. CARLSON: So while it is true that we could install monitoring software and monitor the defendant's devices from here in Brooklyn, I would not be able to monitor a router because you need to be in proximity to a router to connect to it to monitor that router; therefore, I would not be able to monitor what devices are actually in that house. I would only be able to monitor the devices that the defendant has disclosed are in the house. . . . [I]f there is a problem with a device or possible tampering with the software or any kind of troubleshooting issue where we would need to put our hands on this device, Florida would not be able to accommodate that.
>
> THE COURT: See, how can I penalize the people because Florida isn't engaged? I'm troubled by that. (*Id.* at 17–19).

For most of the past two years, the Government and Pretrial Services have represented that cyber-monitoring would be either impossible or impracticable at Defendant's parents' home in Florida. And as internet-access and monitoring were critical to the Court's bail-assessment, the lack of adequate controls weighed heavily in favor of Defendant's continued detention. That assessment changed on June 2, 2020, when the Government reversed-course and informed the Court that "Pretrial Services in the Eastern District of New York is able to remotely monitor electronic devices, including a router." ECF 65 at 2. Why it took the Government and Pretrial Services from September 2018 until June 2020 to pin that down is beyond this Court's understanding. *See* Sept. 21, 2018 Tr. at 41, 46, 47–48; ECF 65 (filed June

2, 2020). Had the Court been accurately informed sooner, its decisions denying bail might well have been different.

II.

The Bail Reform Act presumes that for certain offenses, including those charged against Defendant, pretrial detention is appropriate as "no condition or combination of conditions will reasonably assure the appearance of the person . . . and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). This presumption may be rebutted by Defendant upon the presentation of evidence that he is neither a danger nor a risk of flight, and even "in a presumption case, the government retains the ultimate burden of persuasion by clear and convincing evidence that the defendant presents a danger to the community" and "by the lesser standard of a preponderance of the evidence that the defendant presents a risk of flight." *See United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001).

The Government's appellate briefing makes much of the Court's supposed failure to address this issue in the June 4 Order directing Deutsch's release. *See* 2d. Cir. Case No. 20-1745, Docs. 43, 54. Of course, the Court has recognized the presumption in prior decisions on Defendant's bail and, in any event, has always made it clear that the decision to grant or deny bail turned on whether Defendant "would not now be a risk of flight or a danger to the community." *See* June 4 Order

at 1.[2] Nevertheless, to avoid confusion going forward, this is the portion of the Court's decision that addresses the Bail Reform Act's statutory presumption under 18 U.S.C. § 3142(e).

The Court finds Defendant has rebutted the presumption that "no conditions or combination of conditions" can reasonably assure the safety of the community or his appearance. As to the former, all of Defendant's alleged criminal conduct took place online, and since June 2 the Government has represented Pretrial Services can "remotely monitor electronic devices, including a router." ECF 65 at 2. On June 25, Pretrial Services informed the Second Circuit Court of Appeals that it possessed "complete control of the internet in" Defendant's home and, further, that Defendant was in "full compliance" with the June 4 conditions of release. 2d. Cir. Case No. 20-1745, Doc. 57. On June 30, Pretrial Services notified this Court that it was "now monitoring all internet capable devices in the defendant's residence including the router." June 30 Memorandum.

Moreover, Defendant was released in the state action on his own recognizance and—from December 2017 until September 2018 when he was arrested on the federal counts—he attended all his state-court appearances and fully complied with

---

[2] *See also* ECF 7, Sept. 19, 2018 Order of Detention (finding the "presumption not overcome"); ECF 20, Dec. 13, 2018, Memorandum & Order ("The Bail Reform Act ("BRA") establishes a presumption that defendants charged with conduct like Deutsch must be held in pretrial detention. 18 U.S.C. § 3142(e)(3)(D).").

the terms of his release. The Government has conceded that, to date, there is no evidence Defendant had any illegal contact with a minor or obtained an internet-capable device during those ten months. *See* Sept. 19, 2018 Tr. at 34; May 29, 2020 Tr. at 14–15. Indeed, the Court is not aware of any allegation that Defendant engaged in any criminal behavior since May 2017—seven months before his arrest on the state charges.

As to Defendant's risk of flight, Defendant is subject to GPS location monitoring and his future appearance in Court is secured against his parents' home. We reiterate that those conditions satisfy the Court that Defendant is not a risk of flight. *See* June 4 Order at 1 ("sufficient conditions [were] put in place to satisfy me that the defendant would not now be a risk of flight"). Additionally, Pretrial Services confirmed that Defendant "traveled immediately to the Middle District of Florida" to live with his parents and that "Pretrial Services in the Middle District of Florida [have] advised that the defendant has remained in compliance" with the conditions of release. June 30 Memorandum.

The Court has addressed the statutory presumption under § 3142(e) and finds Defendant has rebutted that presumption. Accordingly, we assess if the Government has carried its burden of showing "by clear and convincing evidence that the defendant presents a danger to the community" and showing by a "preponderance

of the evidence that he is a risk of flight." *United States v. Mercedes,* 254 F.3d 433, 436 (2d Cir. 2001). It has not.

The Government must prove the defendant is so irremediably dangerous that "no condition or combination of conditions will reasonably assure . . . the safety of any other person." 18 U.S.C. § 3142(e)(1). Its argument that Defendant should remain behind bars because it is impossible to ensure he won't evade remote monitoring by buying and concealing other routers or internet capable devices is unavailing. *See* 2d. Cir. Case No. 20-1745, Doc. 43 at 60. As the Court explained already:

> While it is true that access to the Internet is more available than ever, the government's theory would imply that anyone charged with like conduct must be held in pretrial detention.
> . . .
> Embracing the government's argument in this case would amount to setting a *de facto* rule that anyone charged with similar conduct must be held in pretrial detention. That would be at odds with the government's statutory burden to prove by clear and convincing evidence that the defendant poses a danger to the community. The Court holds that the government did not meet that burden here. (Dec. 13, 2018 Order at 4–5.)

As to evidence of Defendant's risk of flight, the Government points to the September 25, 2018 phone call in which Deutsch suggested that his parents pretend to have an "emergency" in Florida. Again, the Court has addressed this issue before:

> I don't think he would be in jail if not for the stupid thing that he tried to do by talking to his father about how he could avoid detection. That's why he's in jail. And I think he's learned his lesson, and I doubt very much that he will ever let that happen again. He was caught once. He

> will be caught again. His father will lose his house, and he will be the guardian, the custodian, and there are monitors that we can put in place here. (May 29, 2020 Tr. at 24).

We conclude Defendant has rebutted the presumption in favor of detention and the Government has not carried its burden—neither now nor back on June 4—of showing the need for pretrial detention. *United States v. Mercedes,* 254 F.3d 433, 436 (2d Cir. 2001).

III.

The Bail Reform Act lists four factors as relevant to the determination of whether the bail package is adequate to "reasonably assure . . . the safety of any other person and the community": (1) the nature and circumstances of the offenses charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g).

While the charged crimes are deplorable, the "nature and circumstances" of the alleged conduct relate solely to online communications Defendant had with minors. That behavior is undoubtedly serious but Defendant is not accused of coming into any physical contact with children or facilitating such contact by others, and there is nothing in his background other than a conclusory statement from his resume showing he is unusually adept at evading computer monitoring. Also,

whatever quantum of evidence the Government has to present at trial—and the Court notes it may be significant—that alone does not militate in favor of Defendant's continued pretrial confinement.

Additionally, while 'access to counsel' is not a 3142(g) factor, the Court nevertheless rejects the notion that Defendant has no more access to counsel now than he did while detained at MDC. *See* ECFs 62, 65. MDC provides for 15- to 30-minute legal phone calls on weekdays, with phone-time shared among the 300 inmates on Defendant's floor, all of whom are pretrial. *See* ECF 61 at 3 & n.2. Residing in his parent's home, Defendant has unlimited opportunity to talk with his counsel by phone.

IV.

Finally, throughout Defendant's pretrial confinement, the Court has been sensitive that requests for adjournment have kept Defendant's right to trial "in suspended animation," June 4 Order at 3:

- THE COURT: . . . [W]e have set this case down for a trial on December 2nd. And I think I told you before that I think sometimes the best way to handle these matters is to have this trial because we can't delay.

  MS. VON DORNUM: . . . On December 10th I have an oral argument on a death penalty case in the First Circuit.

  . . .

  . . . I will be preparing for that. It will be difficult to do both things at once to my best ability and given the high stakes in both, I would not want to disadvantage either client in that way.

. . .

THE COURT: December 17th you'll be ready? There's not going to be any adjournments. I'm going to make arrangements to be here on December 17th and we will try it that week. We have a firm date. You can handle a couple of weeks' adjournment. It's not going to happen again. (Oct. 24, 2019 Tr. at 3–7).

- MS. VON DORNUM: Your Honor, I am just going to say it on the record: We cannot effectively represent someone facing a 15-year mandatory minimum when we have two weekdays to do that and have to engage investigators to look into four minor victims who will be very hard to track down. It is not fair to the defendant.

. . .

THE COURT: Look, if I give you an adjournment [to January 2020] there is not going to be another one.

MS. VON DORNUM: I understand.

THE COURT: I don't care what your trial schedule is like.

. . .

MS. FARRELL: . . . I don't think it would be fair to anybody in the courtroom to go that close to my due date, including—especially the jury. I mean it would just be problematic.

THE COURT: Are you taking maternity leave?

MS. FARRELL: Just three months. I'll be back in the spring.

THE COURT: I will kick it over to [June 2020]. I am doing this partially against my better judgment, but there is never going to be another judgment. Never, never, never another adjournment.

The record is clear. I really think that the Government has been fair and reasonable here. I have not seen where they have been inappropriate at all, but you are making a plea here that, on balance, your client's 15 years of liberty is at issue. I will let that be the dominant consideration and I will give you the adjournment. The last one.

. . .

THE COURT: All right. So, Ms. Farrell, I know you are disappointed here, but in the long run this person is looking at a lot of

> jailtime and a couple of months here is the trade-off and this way you will be free.
>
> . . .
>
> THE COURT: June 8th. All right, and that is absolutely going to be the date.
>
> . . .
>
> . . . [T]his is why this is not an easy job because somebody is always going to be disappointed with your rulings. But I think on balance I will feel more comfortable that we did this. There is no excuses anymore. The defendant has ample time. (Dec. 9, 2019 Tr. at 13, 15, 16, 17–18).

- THE COURT: So here is my dilemma. I do not want to keep a person hostage because we have a trial scheduled in two months. (Oct. 24, 2019 Tr. at 19).

- THE COURT: The reality is we have a situation that did not exist before. I know that. He wanted to adjourn and adjourn and grant adjournments. But now the case is set for trial and it's not going to be able to adjourn them anymore. (May 29, 2020 Tr. at 15–16).

- THE COURT: So we will adjourn the trial to September 21st by necessity. I would have liked to have had it by the scheduled date of June, but it's just not possible to do that. So that's one of the reason why we have to talk to everybody today.

  And I am somewhat sensitive to the fact that Mr. Deutsch is being denied the opportunity to have a jury say "not guilty," which is his right, for an additional three to four months, and I am uncomfortable with that. And that's one real reason why I think that I'm granting bail under these circumstances. (*Id.* at 4).

Defendant's trial would have taken place in January, or certainly well in advance of June, if not for the Court's desire to accommodate the Government's

appropriate maternity-leave concern. The Court has expressed, time and again, that an expeditious trial was the best "antidote" for Defendant's repeated pleas for bail. *See, e.g.*, Dec. 9, 2019 Tr. at 3. Due to circumstances beyond anyone's control, the June trial was no longer possible. At a minimum—and having weighed the §3142(g) factors and addressed the rebuttable presumption of continued detention—Defendant's pretrial release will enable him and his counsel to start preparing now for a trial as soon as practicable.

* * *

For the foregoing reasons, the Court orders Defendant's pretrial release subject to the same conditions imposed under the June 4 Order.

**SO ORDERED**.

_/S/ Frederic Block___________
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
July 1, 2020